IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA23-830

Filed 19 March 2025

Watauga County, Nos. 22 JA 41–42

IN THE MATTER OF: B.C., I.C.

Appeal by respondent-mother from orders entered 23 November 2022 by Judge Rebecca Eggers-Gryder and 11 January 2023 by Judge Hal Harrison in Watauga County District Court. Heard in the Court of Appeals 4 March 2025.

*di Santi Capua & Garrett, PLLC, by Chelsea Bell Garrett, for petitioner-appellee Watauga County Department of Social Services.*

*Ellis & Winters LLP, by James M. Weiss and Madeline Pfefferle, for the guardian ad litem.*

*King Law Offices, P.C., by Patrick K. Bryan, Krista Peace, Erin McCoy, and Michael Ian Maddox, for respondent-appellant mother.*

PER CURIAM.

Respondent-Mother challenges the adjudication of her minor children as abused, neglected, and dependent juveniles and the subsequent disposition that the district court entered for the children. After careful review, we affirm the adjudication of the children as abused and neglected juveniles but vacate the adjudication of the children as dependent. The disposition order is left undisturbed.

I.     **Factual Background and Procedural History**

This matter concerns "Ivy" and "Betty,"[1] who were 11 and 10 years old respectively, at the time of the adjudication hearing. The Watauga County Department of Social Services (DSS) became involved after Respondent-Mother reported to the Blowing Rock Police Department (BRPD) on 26 March 2021 that her husband—the children's father—had physically and sexually abused Ivy and Betty, as well as Respondent-Mother. Specifically, Respondent-Mother told a BRPD detective that upon discovering that Ivy and Betty had been masturbating, she became worried about the girls sleeping and snuggling with the father.

DSS was contacted about Respondent-Mother's report and Respondent-Mother brought Ivy and Betty to the Child Advocacy Center (CAC) for forensic interviews. During the interviews, neither child reported sexual abuse by the father, although Ivy described the father as strict and sometimes accidentally hurting her, while Betty stated that the father did not do anything that made her sad or mad. The girls did not report sexual abuse or domestic violence to the DSS Child Protective Services (CPS) investigator, who formed an opinion that Respondent-Mother's report was not credible. Nevertheless, DSS assisted Respondent-Mother in obtaining a domestic violence protective order (DVPO), asked the father to leave the family home, and entered into a safety plan with Respondent-Mother.

Shortly after making the initial BRPD report, Respondent-Mother made an

---

[1] Pseudonyms are utilized to protect the privacy of the juveniles. N.C.R. App. P. 42(b).

audio recording of herself talking to the children about the allegations against the father. When Respondent-Mother played the recording for the DSS CPS investigator, he became concerned that Respondent-Mother was coaching Ivy and Betty, and he advised her not to ask them leading questions about any abuse lest the DSS investigation be compromised. Between 31 March and 18 April 2021, however, Respondent-Mother took video recordings of Ivy and Betty masturbating, which she showed to DSS staff members, and then requested another forensic interview of Ivy, claiming that Ivy had disclosed additional abuse by the father. The DSS CPS investigator declined to conduct such an interview, noting that the interview process itself could be traumatic for a child. Regardless, Respondent-Mother took Ivy and Betty to their pediatrician's office to discuss the alleged abuse, which ultimately resulted in a referral to DSS for medical examinations and additional forensic interviews with the children.

On 20 April 2021, during an examination by a nurse practitioner, both children reported their belief that the examination was a result of their parents getting a divorce and denied being touched inappropriately by anyone. Ivy, however, stated that the father would sometimes "rub his private[s]" while she was sleeping with him and that she had begun to sometimes do the same, referring to masturbation. Betty reported that the father sometimes punched or hit her but did not report any sexual acts by herself or the father. For her part, Respondent-Mother denied any physical aggression by the father or other domestic violence in the home, despite a DVPO being

in effect.

During its investigation, DSS received materials documenting Respondent-Mother's communications with and payment to a "spiritual advisor" named Tatum Sawyer. Sawyer told Respondent-Mother that Ivy and Betty had been sexually abused in their past lives and advised that the resulting trauma could only be relieved through orgasm. Those communications took place less than six months before Respondent-Mother's initial report that her children were masturbating, which in turn caused Respondent-Mother to believe that they had been sexually abused by the father.

In July 2021, a forensic custody evaluation by Dr. Jennifer Cappelletty, a licensed psychologist, was ordered in a separate civil custody case between Respondent-Mother and the father. Cappelletty was able to complete a portion of the evaluation, but Respondent-Mother refused to permit Ivy and Betty to participate in a bonding assessment with the father. At that point, Cappelletty became concerned that Respondent-Mother's growing hostility and refusal to comply with the process would taint Cappelletty's ability to evaluate the family. As a result, in June 2022, DSS referred the family for a Child and Family Evaluation which included interviews with the family members by Shonnon Purcell, P.C.

The following month, July 2022, Purcell expressed concerns about the consistency of the allegations of abuse made by Ivy, Betty, and Respondent-Mother, and also about potential damage to the relationship between the children and the

father resulting from Respondent-Mother's actions. Later that month, DSS learned of Respondent-Mother's testimony in the civil custody case in which Respondent-Mother described her video recording of Ivy and Betty masturbating as well as a "ceremony" she conducted with the children in which photographs of the father were burned. At that point, although the DSS investigation into the father's alleged sexual abuse remained ongoing, DSS was sufficiently concerned about Respondent-Mother's actions to file juvenile petitions on 25 July 2022 alleging that Ivy and Betty—who had then been in the sole care of Respondent-Mother for a year—were abused, neglected, and dependent juveniles. On the same date, DSS obtained nonsecure custody of Ivy and Betty and placed the children with their paternal cousin.

An adjudication and disposition hearing on the juvenile petitions was held in Watauga County District Court over eight days between August and November 2022. On 23 November 2022, the court entered an order adjudicating both Ivy and Betty to be 1) abused juveniles due to serious emotional damage created or allowed by Respondent-Mother; 2) neglected juveniles due to an injurious living environment created or allowed by Respondent-Mother; and 3) dependent juveniles in that the parents were not able to care for or supervise them and lacked an appropriate alternative child care option. The children remained in the legal custody of DSS and in a kinship placement with their paternal cousin, with an interim plan of reunification with both parents. On 11 January 2023, the court entered a disposition order continuing legal and physical custody with DSS, the kinship placement,

supervised visitation for Respondent-Mother, and a primary permanency plan of reunification with both parents. Respondent-Mother timely filed notice of appeal from the adjudication and disposition orders on 7 February 2023.

## II. Analysis

On appeal, Respondent-Mother presents three arguments to this Court: 1) that the district court erred in adjudicating the girls as abused, neglected, and dependent juveniles because the findings of fact supporting the adjudication are improper; 2) that the court violated her due process rights during the adjudication hearing; and 3) that the court's dispositional findings of fact and conclusions of law are erroneous because they "are presupposed upon th[e] findings and conclusions in the adjudication order." As discussed below, we affirm the adjudication order as to abuse and neglect but vacate as to dependency. We affirm the disposition order.

## A. Standard of review

In an abuse, neglect, or dependency case, we review a district

> court's adjudication to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law. A trial court's finding of an ultimate fact is conclusive on appeal if the evidentiary facts reasonably support the trial court's ultimate finding of fact. Where no objection is made to a finding of fact by the trial court, the finding is presumed to be supported by competent evidence and is binding on appeal.

*In re G.C.*, 384 N.C. 62, 65–66, 884 S.E.2d 658, 661 (2023) (cleaned up). We review the court's conclusions of law concerning adjudication de novo, that is, anew and

without deference to the lower tribunal. *Id.* at 66, 884 S.E.2d at 661. Finally, where some findings of fact are determined not to be supported by clear, cogent, and convincing evidence, but "ample other findings of fact support an adjudication . . . , erroneous findings unnecessary to the determination do not constitute reversible error." *In re T.M.*, 180 N.C App. 539, 547, 638 S.E.2d 236, 240 (2006).

### B. Challenged findings of fact in the adjudication order

Respondent-Mother presents two contentions of error regarding the district court's findings of fact: 1) that the "court impermissibly delegated its fact[-]finding duty" in that it "copy and paste[d]" sources and incorporated them into the findings of fact; and 2) that the court "failed to employ a process of logical reasoning . . . . [or] reconcile fundamental inconsistencies" in the evidence because many of the findings are statements of what was alleged, believed, or testified to in the case. As explained below, neither alleged flaw necessarily invalidates the findings of fact.

Our appellate courts have frequently been asked to address arguments centered on the style and substance of findings of fact in orders entered pursuant to Chapter 7B. As to Respondent-Mother's first argument, in determining whether factual findings taken verbatim (or nearly so) from juvenile petitions and other sources are proper, this Court has held "that it is not per se reversible error for a trial court's findings of fact to mirror the wording of a party's pleading . . . . [or to fail] to eliminate unoriginal prose." *In re J.W.*, 241 N.C. App. 44, 45, 772 S.E.2d 249, 251, *disc. review denied*, 368 N.C. 290, 776 S.E.2d 202 (2015). Instead, a reviewing court

> will examine whether the record of the proceedings demonstrates that the trial court, through processes of logical reasoning, based on the evidentiary facts before it, found the ultimate facts necessary to dispose of the case. If we are confident the trial court did so, it is irrelevant whether those findings appear cut-and-pasted from a party's earlier pleading or submission.

*Id.* at 45–46, 772 S.E.2d at 251.

Likewise, as to Respondent-Mother's second contention, our Supreme Court has emphasized that "there is nothing impermissible about describing testimony, so long as the court ultimately makes its own findings, resolving any material disputes." *In re A.E.*, 379 N.C. 177, 185, 864 S.E.2d 487, 495 (2021) (cleaned up). In that case, "[i]n addition to making findings of fact that recited the testimony of various witnesses, the trial court made findings of fact that resolved a number of material disputes in the record evidence." *Id.* at 186, 864 S.E.2d at 496. "As a result, these findings of fact [reciting evidence we]re appropriately considered in evaluating the lawfulness of the trial court's" order. *Id.*

In the instant case, in accordance with this precedent, we consider whether the challenged findings reflect that the district court considered the evidence and made findings consistent therewith. As an initial matter, we note that while Respondent-Mother purports to challenge findings of fact 5–60 as not supported by clear and convincing evidence, she presents specific arguments directly addressing only a handful of these findings:

*Finding of fact 5*—This lengthy finding, which includes 35 subparts, begins with the court clarifying the allegation at the heart of the juvenile petitions: whether Respondent-Mother was causing trauma to her daughters by her actions, rather than whether allegations of sexual abuse of the children by the father were true. Accordingly, a number of the subparts of finding of fact 5—a to g, i to y, and aa to ii—are recitations of the allegations that DSS made in the juvenile petitions and related aspects of the ongoing DSS investigation of the family. The district court included explicit credibility determinations in subparts h and z; to wit, that Respondent-Mother's explanation of why she made the March 2021 audio recording of her leading discussion with the children was "not credible" and that the court found "concerning" Respondent-Mother's responses to Cappelletty during the forensic evaluation, including her statement that she was "keep[ing] an open mind" regarding the possibility of her daughters having been sexually abused in past lives. In light of the many independent findings made by the court in resolving disputed material facts as discussed below, finding of fact 5 is proper and was appropriately considered by the court. *See id.* at 186, 864 S.E.2d at 496.

*Finding of fact 6*—Respondent-Mother contends that this finding "is, in actuality, a conclusion of law": "the children are in an injurious and emotionally abusive environment and . . . it is contrary to their welfare to remain in the custody of either parent at this time." We agree, but as discussed below, Cappelletty's report and expert opinion—as well as other findings of fact—support this conclusion.

*Finding of fact 7*—Respondent-Mother contends that this finding, listing more than 100 sources—including court orders, interviews with members of the family, photographs, medical records, and affidavits—on which Cappelletty relied in conducting her evaluation and forming her opinion is not proper for two reasons. She maintains first that it is only a "copy and paste" of the list provided in Cappelletty's report, and second, that the sources themselves "were not before the trial court." As explained above, it is not error for a court to include verbatim portions of reports as findings of fact, so long as the findings demonstrate the court's logical reasoning in making the necessary ultimate factual determinations. *See J.W.*, 241 N.C. App. at 45–46, 772 S.E.2d at 251. Nor do the resources that an expert consulted in forming her opinion need to be admitted or admissible at a hearing or trial. *See* N.C. Gen. Stat. § 8C-1, Rule 703 (2023) ("The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing." Further, if the facts or data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible into evidence."). Accordingly, finding of fact 7 is a proper finding of fact.

*Finding of fact 8*—Respondent-Mother argues that this finding "offers nothing more than the court's *ipse dixit*[2] assertion that 'Dr. Cappelletty was thorough in

---

[2] "Something asserted but not proved." *Ipse dixit*, Black's Law Dictionary (12th ed. 2024).

gathering all this information to formulate her report and the information supports her opinions.' " We must reject her assertion that this finding "cannot be supported by clear and convincing evidence as much of 'the information' referenced in the Adjudication Order was never introduced or presented to the court in any substantive capacity during the proceedings."

As just noted, it was appropriate for Cappelletty, who was admitted as an expert in the field of forensic psychology with a specialty in sexual abuse, to rely on the sources cited by the court in finding of fact 7 in forming her opinion as to whether the children were being traumatized by Respondent-Mother's actions regardless of whether those sources were admitted or admissible. *See id.* Moreover, the district court, in its role as finder of fact, was charged with weighing the evidence and making credibility determinations, and therefore its characterization of Cappelletty as "thorough" was appropriate. *See Nash Cty. Dep't of Social Servs. v. Beamon*, 126 N.C. App. 536, 539, 485 S.E.2d 851, 852 ("[T]he trial court sat as fact[-]finder as well as arbiter of the law. The fact[-]finder has the right to consider all, some or none of a witness'[s] testimony; in addition, the fact[-]finder decides the appropriate weight to place on the testimony."), *disc. review denied*, 347 N.C. 268, 493 S.E.2d 655 (1997).

*Finding of fact 10*—Respondent-Mother takes issue with the court "cherry pick[ing] parts of Dr. Cappelletty's report" regarding the behavior and statements of Ivy "in such a way that mischaracterizes the evidence in the record." As just noted, however, the district court was entitled to assess witness credibility and weigh the

evidence before it, and then to include in this finding of fact the portions of the report that it found credible and relevant. *See id.*

*Finding of fact 11*—Respondent-Mother first takes issue with the court including "verbatim recitations of Dr. Cappelletty's report," yet she acknowledges the introductory language in this finding in which the court stated that it was *adopting* the doctor's findings and recommendations. Such language indicates that the court considered the evidence in the report, found it credible, and thus adopted the results. This is a proper exercise of the court's discretion as fact-finder. *See id.* Respondent-Mother also characterizes as "circular" subpart d, incorrectly identified in her brief as subpart a, which states that the "research is clear and, while ignoring a source of trauma can be harmful to a child, treating a child for trauma [he or she] did not actually experience also causes the child harm." We perceive nothing "circular" about this statement and, given that the allegations in the petitions largely concern whether Respondent-Mother was traumatizing the children based upon her *belief* that sexual abuse had occurred *regardless of whether any such abuse had actually taken place*, the court's fact-finding determination that "research is clear" on that point is both relevant and supported by clear, cogent, and convincing evidence in the form of Cappelletty's testimony and report.

*Finding of fact 32*—Respondent-Mother characterizes this finding as an impermissible delegation of the district court's fact-finding duty, in that the court "transpose[d]" Cappelletty's third recommendation from the report—namely,

that 'the court consider that [Cappelletty] found evidence of significant parental alienation on the part of [Respondent-Mother] regarding systematic efforts to alienate [Ivy] and [Betty] from their father'. . . , into a finding of fact that, '[t]he recommendation of Dr. Cappelletty's report *provides evidence* that Respondent[-]Mother has systematically made efforts to alienate [Ivy] and [Betty] from [the f]ather.

Again, there is no error in using verbatim language from the report, given the portion of finding of fact 11 in which the court, based on Cappelletty's report, specifically "f[ound] as fact . . . [t]hat there has been significant parental alienation on the part of [Respondent-Mother] regarding systematic efforts to alienate [Ivy] and [Betty] from their father." *See J.W.*, 241 N.C. App. at 45–46, 772 S.E.2d at 251. Further, the court was entitled as fact-finder to determine that the report was credible on the issue in question such that it "provide[d] evidence." *See Nash Cty.*, 126 N.C. App. at 539, 485 S.E.2d at 852.

*Finding of fact 54—* Respondent-Mother makes only a general argument that "findings 12-60 do not demonstrate a 'process of logical reasoning' . . . as shown by unreconciled inconsistencies of evidence and/or by plain failure of said findings to be supported by clear and convincing evidence in the record." (Quoting *In re B.P.*, 257 N.C. App. 424, 432, 809 S.E.2d 914, 919 (2018)). Upon review, we agree that one portion of finding of fact 54 is unsupported. This finding states:

Given the allegations of sex abuse by . . . the[ f]ather against the Juveniles, and the allegations that Respondent[-]Mother created an injurious and emotionally abusive environment, there was no other alternative but to

place the Juveniles outside the home, with a neutral relative. The Juveniles are dependent in that both the Respondent[-]Parents are unable to provide for the Juveniles['] care or supervision and *lack appropriate alternative child care.*

(Emphasis added).

No party has cited—and we have not independently located—any evidence before the court at the adjudication hearing concerning either parent's offer, or lack thereof, of an "appropriate alternative child care" option for Ivy and Betty once they were removed from the custody of Respondent-Mother. *See* N.C. Gen. Stat. § 7B-101(9). Rather, the record indicates that the children were in a kinship placement with their paternal cousin at the time of the adjudication hearings,[3] and that placement was continued in both the interim disposition set forth in the adjudication order and later in the disposition order. Given the lack of any record evidence regarding Respondent-Mother's or the father's ability to provide an appropriate alternative child care option—including whether the kinship placement utilized was offered by one or both of the parents—we cannot uphold the part of finding of fact 54 which states that the parents "lack appropriate alternative child care."

*Findings of fact 12 through 60*—As previously observed, Respondent-Mother makes a general argument that "findings 12-60 do not demonstrate a 'process of logical reasoning' . . . as shown by unreconciled inconsistencies of evidence and/or by

---

[3] The kinship placement appears to date from July 2022, when DSS obtained nonsecure custody of Ivy and Betty.

plain failure of said findings to be supported by clear and convincing evidence in the record." (Quoting *B.P.*, 257 N.C. App. at 432, 809 S.E.2d at 919). We do not find the examples of purported inconsistencies cited by Respondent-Mother meritorious:

- Whether the BRPD or DSS "set up the forensic interview" conducted with the children on 26 March 2021 is a matter of no seeming relevance to the adjudications here.
- The court's failure to "demonstrate how [it] reconciled the inconsistent testimony" made by the children during the forensic interview is not error because a fact-finder is not required to provide such justifications, as evidenced by Respondent-Mother's inability to cite authority for her proposition.
- The court was entitled to make findings of fact based on some portions of a witness's testimony but not on others. *See Nash Cty.*, 126 N.C. App. at 539, 485 S.E.2d at 852.
- The court was not inconsistent in making finding of fact 31—that "Dr. Cap[p]elletty's report and her testimony really provides the entire picture, the entire history of what the Juveniles have endured"— without noting that DSS is still investigating the allegations against the father or that Cappelletty was not able to complete her evaluation. Omission of the former fact is not "inconsistent" as the petitions here concern Respondent-Mother's allegedly traumatizing behavior and not any abuse by the father. The latter omission is not inconsistent given the court's finding that Cappelletty's inability to complete the evaluation was due to Respondent-Mother's failure to cooperate with the process and her efforts to sabotage the DSS investigation.
- Finding of fact 28—that the children were not traumatized by discussing with Cappelletty a bonding assessment at which the father would have been present but "became traumatized when they got home and talked to Respondent[-]Mother"—is supported by testimony elicited from Cappelletty on cross-examination. She explained that the children were not upset about the prospect of the bonding assessment when they left an appointment with her, but that Respondent-Mother told Cappelletty a few weeks later that Ivy and Betty were then experiencing "a great deal of distress" about the bonding assessment.

In sum, many of Respondent-Mother's arguments purporting to challenge the district court's findings of fact as failing to resolve inconsistencies in the evidence

appear to be requests that this Court reweigh the evidence or second-guess the district court's credibility determinations, which is not our role. *See In re S.C.R.*, 198 N.C. App. 525, 531–32, 679 S.E.2d 905, 909 ("It is the duty of the trial judge to consider and weigh all of the competent evidence, and to determine the credibility of the witnesses and the weight to be given their testimony." (cleaned up)), *appeal dismissed*, 363 N.C. 654, 686 S.E.2d 676 (2009). Further, there is no error in the findings of fact that use the wording of evidentiary materials, because "the trial court employed a process of logical reasoning, which is evidenced through its having made several independent findings of fact." *B.P.*, 257 N.C. App. at 432, 809 S.E.2d at 918–19 (internal quotation marks omitted). However, we conclude that the portion of finding of fact 54 addressing the parents' ability to offer appropriate alternative child care is not supported by clear, cogent, and convincing evidence.

**C. Challenged conclusion of law in the adjudication order**

We next turn to Respondent-Mother's assertions that the district court's proper findings of fact did not support its conclusion of law that Ivy and Betty were abused, neglected, and dependent juveniles.

**1. Abuse and neglect**

Pertinent to this case, the Juvenile Code defines an abused juvenile as one whose parent "[c]reates or allows to be created serious emotional damage to the juvenile[, as] . . . evidenced by [the] juvenile's severe anxiety, depression, withdrawal, or aggressive behavior toward himself or others." N.C. Gen. Stat. § 7B-101(1)(e).

Respondent-Mother contends that the findings of fact do not support the district court's conclusion that the children are abused juveniles in that Respondent-Mother "create[d] or allow[ed] to be created serious emotional damage to" Ivy and Betty. *Id.*

A juvenile is neglected under the Code, *inter alia*, if her parent has "[c]reate[d] or allow[ed] to be created a living environment that is injurious to the juvenile's welfare." *Id.* § 7B-101(15)(e). To support a neglect adjudication, a "trial court must find that there were 'current circumstances' that rendered [the juvenile]'s environment unsafe." *In re D.S.*, 286 N.C. App. 1, 16, 879 S.E.2d 335, 345 (2022). "In order to adjudicate a juvenile neglected, our courts have additionally required that there be some physical, mental, or emotional impairment of the juvenile or a substantial risk of such impairment as a consequence of the failure to provide proper care, supervision, or discipline." *In re Stumbo*, 357 N.C. 279, 283, 582 S.E.2d 255, 258 (2003) (cleaned up). Respondent-Mother maintains that the court's factual findings do not show that her actions caused any "physical, mental, or emotional impairment of [Ivy and Betty] or a substantial risk of such impairment," *id.* (citation omitted), and that the district court failed to assess the "current circumstances." *D.S.*, 286 N.C. App. at 16, 879 S.E.2d at 345.

In our view, the court's conclusions of law and the resulting adjudications of neglect and abuse are supported by its proper findings of fact that: Respondent-Mother had, through systematic efforts, caused "significant parental alienation" between the children and the father; the parental alienation had caused "significant

emotional harm to" and "been detrimental to the well-being of" the children; "while ignoring a source of trauma can be harmful to a child, treating a child for a trauma [he or she] did not actually experience also causes the child harm"; during the year in which the children were in the sole care of Respondent-Mother, "their emotional distress ha[d] escalated" because Respondent-Mother was not "able or willing to provide an environment that [wa]s conducive to her daughters['] healing"; Respondent-Mother had failed to cooperate with interested professionals, ignored court orders regarding the evaluation by Cappelletty, and "actively sabotaged DSS'[s] investigation"; Respondent-Mother coached the children regarding allegations of abuse against the father and took actions which subjected them to unnecessary evaluations about the alleged abuse; Respondent-Mother instigated the burning of photographs of the father as part of a "ceremony" with the children, damaging any potential future relationship with the father; Respondent-Mother attempted to record the children masturbating and then discussed this private aspect of the children's behavior with "so many people" that it will be "emotionally scarring to them" if they ever learn of her actions; Respondent-Mother's demeanor indicated that she did not appreciate the import of "what she ha[d] done" or the significance of her actions as they affected the children; and "[w]hether the sexual abuse [alleged to have been inflicted by the father] happened or not, [the children] have been traumatized by the way that Respondent[-]Mother has handled the situation."

These findings show that Respondent-Mother either caused or escalated the emotional distress and harm to and created potential emotional scarring of Ivy and Betty. She sabotaged the investigation into the allegations she initiated. She refused to follow the recommendations of professionals or comply with court orders. Her agenda of alienating the children from their father, along with her poor judgment, lack of truthfulness, and ongoing unwillingness or inability to understand the harm to Ivy and Betty resulting from her actions—regardless of whether the sexual abuse allegations regarding the father are true—continued up until the time of the hearing. These factual findings meet the criteria set forth by statute and precedent regarding the adjudication of children as abused and neglected juveniles. Accordingly, the court's conclusions of law to that effect are fully supported, and the resulting abuse and neglect adjudications are affirmed.

**2. Dependency**

We do, however, find merit in Respondent-Mother's argument that the district court's conclusion that Ivy and Betty are dependent juveniles cannot be upheld.

A dependent juvenile is defined as a child "in need of assistance or placement because . . . the juvenile's parent . . . is unable to provide for the juvenile's care or supervision *and* lacks an appropriate alternative child care arrangement." N.C. Gen. Stat. § 7B-101(9) (emphasis added). "Under this definition, the trial court must address both (1) the parent's ability to provide care or supervision, and (2) the availability to the parent of alternative child care arrangements." *In re P.M.*, 169 N.C.

App. 423, 427, 610 S.E.2d 403, 406 (2005). As discussed above, the portion of finding of fact 54 regarding an appropriate alternative child care arrangement is not supported by any record evidence. The dependency adjudication as to Ivy and Betty must therefore be vacated. *See B.P.*, 257 N.C. App. at 435, 809 S.E.2d at 920.

### D. Respondent-Mother's due process rights

In her next argument, Respondent-Mother contends that her due process rights were violated by the district court in two ways: that the court 1) "prohibit[ed] her] from presenting a full defense [and] relevant evidence during the adjudication hearing," and 2) "impermissibly relied on [the f]ather's 'stipulation' as a basis for the adjudication of abuse, neglect, and dependency." As just noted, the dependency adjudications are vacated. Regarding the abuse and neglect adjudications, however, Respondent-Mother both misrepresents what occurred at the hearing and misreads the adjudication order.

Respondent-Mother argues that she was not able to present "a full defense" in that she was not able to present evidence that the father had sexually abused Ivy and Betty such that her actions in light of that belief were justified, appropriate, and could not have constituted abuse or neglect of the children. Yet, our review of the hearing transcripts does not support Respondent-Mother's representations that "throughout the adjudication hearing, the trial court repeatedly prohibited [her] from presenting evidence in any way related to alleged sexual abuse perpetrated by [the f]ather upon the subject children."

In support of her position, Respondent-Mother cites four specific objections to testimony at the hearing that were sustained by the court. The first occurred during Respondent-Mother's direct examination when her counsel asked why she made her initial abuse report to law enforcement. Respondent-Mother was allowed to answer, without objection: "Because of the concerns that I ha[d] of the girls' masturbation, because the sexual abuse that [the father] was doing to me. I ha[d] concerns, just not the—what r[o]se up more about the masturbation of the girls [wa]s—[wa]s the fear that they were having to the father." However, when Respondent-Mother answered a follow-up question about how she knew the children were fearful by saying, "They always expressed fear to the[ir] father," a general objection by the father's counsel was sustained. In context, the objection appears to have been sustained on hearsay grounds, given that moments before, the court had sustained an explicit hearsay objection to a question about what Ivy told Respondent-Mother about bruises she received. In sustaining that objection, the court explained that if Ivy testified, she could be asked, but Respondent-Mother could not repeat what Ivy told her. In this light, it appears that Respondent-Mother was not prohibited from mentioning the alleged abuse; rather, she was simply not allowed to give hearsay testimony about what the children said.

On the second occasion cited, Respondent-Mother's counsel asked her what occurred just before she made the audio recording of the children that led to concerns about coaching. The transcript reflects that the objection was sustained because the

question was leading, not due to any reference to alleged sexual abuse by the father. Moreover, once her counsel rephrased the question, Respondent-Mother was allowed to testify regarding the conversations she had with Ivy and Betty both before and during the audio recording.

The third point during the hearing where Respondent-Mother contends her due process rights were violated involved testimony from one of her witnesses, the director of a religious organization. He was asked by her counsel about his opinions "with regard to the connection or any connection between . . . finding out whether the children were actually sexually abused and doing the bonding assessment" and what Respondent-Mother told him "about the bonding assessment and sexual abuse that you already talked about." The court sustained general objections to each question, and in a brief discussion amongst counsel and the court, it was clarified that the objection was on the ground that the question had been "asked and answered." Respondent-Mother's counsel was then allowed to ask a rephrased version of essentially the same question, without objection: "Can you please tell the [c]ourt what—if my client talked to you about this, obviously, what, if anything, was the connection that my client saw between the bonding assessment and finding out whether the girls were actually sexually abused?" Thus, the issue of the father's alleged sexual abuse was not the basis of the objection, and the topic was not prohibited.

In the final instance identified by Respondent-Mother, the court sustained two objections to questions as to whether Betty had disclosed sexual abuse on the basis that the questions were leading. Once again, it was the *form* of the questions and not their reference to alleged sexual abuse that led to the sustained objections. Further, Respondent-Mother's counsel chose not to return to the topic by asking non-leading questions.

Moreover, the allegations of sexual abuse by the father were referred to and discussed throughout the hearing by virtually every witness, as shown by both explicit and implicit references to those allegations in the majority of the findings of fact in the adjudication order. The court further noted that those allegations were still under investigation by DSS, despite Respondent-Mother's hampering of that process, and specifically found that "Respondent[-]Mother does not appear to understand the nuances of what DSS'[s] investigation entailed and that DSS'[s] role was to monitor and try to create a plan, *whether* [*the f*]*ather has sexually abused these children or not*" and "[*w*]*hether the sexual abuse happened or not*, [Ivy and Betty] have been traumatized by the way that Respondent[-]Mother has handled the situation with [them]."

Respondent-Mother's final due process contention is that the district court erred in relying on the father's stipulation that allegations of sexual abuse by the father existed, although he strongly denied committing such abuse. She argues that

"there was never a meaningful, or legally sufficient, stipulation" pursuant to N.C.

Gen. Stat. § 7B-807. We are not persuaded.

The relevant statute provides, *inter alia*:

> If the court finds from the evidence, including stipulations
> by a party, that the allegations in the petition have been
> proven by clear and convincing evidence, the court shall so
> state. *A record of specific stipulated adjudicatory facts shall
> be made* by either reducing the facts to a writing, signed by
> each party stipulating to them and submitted to the court;
> or *by reading the facts into the record, followed by an oral
> statement of agreement from each party stipulating to them*.

*Id.* § 7B-807(a) (emphases added).

Adjudicatory finding of fact 5 states:

> The issue raised in this [p]etition was not whether [the
> father] had sexually abused the Juveniles, but whether
> they were experiencing trauma at the hands of
> Respondent[-]Mother. At the commencement of the
> hearing, [the f]ather stipulated in open court, by and
> through his attorney of record, that the factual allegations
> set forth in the [p]etition are true—that there had been
> *allegations* of sexual abuse, but he did deny that the
> allegations themselves were true. . . . The stipulation of
> [the f]ather, the previous testimony of Respondent[-
> ]Mother, and the additional facts set forth hereinbelow,
> establish by clear, cogent and convincing evidence that the
> Juveniles are <u>Abused</u>, <u>Neglected</u> and <u>Dependent</u> Juveniles
> . . . .

The hearing transcript reveals that counsel for the father stated for the record

in open court that the father "*stipulates to the facts as alleged in the petitions* filed by

DSS, and I want to, again, clarify that *we are not disputing the fact that allegations

have been made against* [*the father*]. We do wholeheartedly and as vigorously as

possible *deny that those allegations are true.*" These statements fully comport with the requirements for stipulations set forth in N.C. Gen. Stat. § 7B-807(a), and accordingly, the stipulation was legally sufficient.

Respondent-Mother maintains that "[t]his is not a stipulation that has any credible meaning or value for purposes of an adjudication. Nevertheless, both DSS and the trial court accepted it as a stipulation. This acceptance, naturally created undue implications for the remainder of the proceedings and, ultimately, the adjudication of" Ivy and Betty. Specifically, she asserts that the stipulation "seemingly operated as a de facto alignment of the parties with DSS and the[ f]ather on one side and Respondent[-]Mother on the other side" and "it apparently relinquished the trial court of its duty to consider the evidence before it regarding the[ f]ather's actions as they related to the 'existence or nonexistence of any of the conditions alleged in a petition.' N.C. Gen. Stat. § 7B-802."

Respondent-Mother's argument reflects her ongoing misapprehension of the factual allegations in the petitions. As the petitions state, the DSS supervisor testified, and the court found, the petitions were filed due to concerns that Ivy and Betty were being harmed by *Respondent-Mother's poor judgment and her noncompliance and interference* with the DSS investigation and the related court orders. Moreover, because Respondent-Mother's noncompliance and interference had—at the time of the hearing—prevented DSS from fully investigating and resolving the truth or falsity of the allegations against the father, *Respondent-*

*Mother's own actions prevented DSS from being able to file any potential petitions based on abuse by the father*. The meaning and value of the father's stipulation was to clarify the bases of the petitions and thus the focus of the adjudication hearing. The district court did not err in relying on the father's legally sufficient stipulation for that purpose.

In sum, each of Respondent-Mother's due process arguments are overruled.

**E.  Challenge to the disposition order**

Respondent-Mother's sole assignment of error as to the district court's disposition order is that the order was "premised and presupposed" upon the findings of fact and conclusions of law in the adjudication order which Respondent-Mother argued were erroneous and unsupported. As explained above, although we vacate the dependency adjudications, we affirm the adjudications of Ivy and Betty as abused and neglected juveniles. Accordingly, we leave the disposition order undisturbed.

**III.   Conclusion**

We affirm the adjudications of Ivy and Betty as abused and neglected juveniles but vacate the adjudications of the children as dependent juveniles. The disposition order is affirmed.

AFFIRMED IN PART; VACATED IN PART.

Panel consisting of Chief Judge DILLON and Judges ZACHARY and FLOOD.